I'd like to start the presentation by talking about the standard of review with respect to the District Court's determination as to whether Mr. Green was disabled per the policy. I'd like to start there for two reasons, one that it has a significant impact on what this Court can do with respect to those findings, and probably more significantly, as I was preparing this case for argument, I realized I could have done a better job of explaining Mr. Green's position, which I'm going to try to do right now. Essentially, Your Honor, the District Court, in making its determination, accepted Sun Mr. Green's disability claim, a vertigo component, and a problem with his orthopedic condition, and that the vertigo component had, you know, he was properly disabled from that, but that that resolved before the end of the elimination period in August, and that the orthopedic problem didn't really, wasn't really diagnosed until March of 2003, at which point, you know, it was beyond the elimination period and simply too late to make a claim for that condition. The judge ruled in interpreting the policy that Mr. Green would not be entitled to benefits for that orthopedic condition unless that's the reason why he left work, and that in June of 2002, Mr. Green had to be disabled from that condition in order to be entitled to benefits under the policy, and that was the basis of the court's ruling that he wasn't, and so, therefore, he's not entitled to benefits, although, even though I don't think there was ever any dispute that Mr. Green was disabled in. Let me ask you a question about the elimination period. Was he, did the district court decide or determine that he was disabled during the elimination period? Forget the reason. The, I think that the, probably as well as I could, strongest thing I can say is that the district court did not dispute that Mr. Green. The district court doesn't dispute. Yeah, yeah. The district court makes findings. The doctor... So, did the district court make a finding here that he was disabled during the elimination period for whatever reason, for the whole period? Not for the whole period. The district court found that Mr. Green was not disabled throughout the entire period. The district court cited to Dr. Hall's opinion that Mr. Green appeared to be disabled or at least left work in June of 2002 because of his vertigo, but that that situation had I understand that, but your contention is, is that he was disabled even, he was disabled during the elimination period, but for another reason. No, your honor. I mean, I'm simply assuming that that dichotomy of dividing up the claim between vertigo component and an orthopedic component is, you know, I'm accepting that for the sake of talking about the standard of review. And if I could, if I can get back to my point, the, the judge made a fundamental error with respect to interpreting the policy when she determined that Mr. Green had to be disabled from his orthopedic condition in June of 2002. Let's assume she made a fundamental error, just a moment. Doesn't he still have to show that during the elimination period that he was disabled? I don't care for whatever reason. He was just disabled. Oh, he, he most, he most certainly does, your honor. And so what is the evidence that shows that he was disabled during the full time of the six months? Well, I mean, first off, your honor, you've got Dr. Shore, who in his opinion, he looked at the evidence of Mr. Green's MRI in March of 2003, which showed a severe back injury with nerve impingement. And he recognized, this frankly has every medical expert who has looked at this, including Sun Life's own Ms. Haley, the nurse reviewer, that this is not something which just showed up, that this is a condition which has existed for years. Now you have to look at this. Okay, the district court didn't take that though and say, well, you know, irrespective of my interpretation of the contract, he was disabled. Well, what, what, what the district court found, your honor, was that he was not making any orthopedic, well, he did not make orthopedic complaints at the time that he left work, your honor. And, and, and the judge did point to two orthopedic related complaints that are in the medical records. Let me ask the question a different way. If we would agree with you that the district court erred in her interpretation of the contract, of the policy, of the laws defining disability, would this case have to go back to the district court? No, your honor. I don't think that it, I don't think that it would. I think that the evidence is virtually undisputed in terms of real life medical evidence that Mr. Green was disabled in June of 2002. I keep asking you though, I keep asking you, did the district court make an express finding that for the elimination, during the elimination period, was he disabled? In a whole 180 days for whatever reason. No, no, the judge, the judge decided exactly the opposite, your honor. The judge decided that Mr. Green. If we were to agree with you, would the case not have to go back to the district court? Again, your honor, I think this, this court in the, in the Jebbian case has said that when a claims handling fiduciary denies a claim in a manner which is not properly founded in law, that this court has the authority to, to issue an award of benefits. But, you know, I mean, we would certainly take a remand to have the district judge look at this under the, under the correct standard. The point that I was, that I was trying to stress, your honor, and I think this is crucial, is the district court did recognize that there were a couple of orthopedic related complaints that Mr. Green made in July of 2002. He complained about a sore arm and he complained about pressure on the back of his head. But she said, but that was after he left work. And the issue is, is was he still covered by insurance then? And the policy is expressed first that insurance ends when a worker is no longer actively at work. But then it goes on to make an exception for that, which is when a employee is not at work because of a disability throughout the elimination period. And so Mr. Green, I don't think anybody disputes that Mr. Green was a truck driver, that he, you know, was disabled because of his vertigo for a period of time. The district court and Sun Life's brief seem to say, well, that cleared up in August of 2002, but yet we've got orthopedic complaints in July of 2002. So that means if the district court decided that, well, no, those complaints had to exist as of June of 2002, that she was applying the wrong standard because, you know, and the district court may or may not have found that those complaints in July of 2002 were significant enough to give rise to a disability complaint because of disability claim, because of the orthopedic complaint as of July of 2002. But the fact is that she failed to decide that issue because she understood the policy as saying, well, you had to be disabled because of the orthopedic complaint in June, and that simply is not what the policy says. So there was an error of law, and that error of law caused the district court to, you know, to decide the case on the wrong basis, which means I submit to this court that this court should take another look at the evidence de novo. And I'd like to sort of switch over and talk about the evidence of disability before this court at this time. And in doing so, I'd like to first point out that it's an occupational policy, and so we have to look at the occupation. And there isn't any dispute that essentially what Mr. Green was doing for a living was manual labor. I mean, he was a truck driver, but he had to lift, you know, unload the trucks and lift 100 pounds. And so that was his job in June of 2002. In March of 2003, the MRI showed a severe back injury with evidence of nerve impingement. I submit it's hardly surprising that his treating physicians at the time said, well, you know, this is a condition which has lasted for years. And there's evidence, as a matter of fact, that, you know, I mean, we don't have the actual medical records here, but we have the physicians describing the medical records that exist back as far as 1998, showing that he had these long-term orthopedic problems. And I submit that, you know, any physician who was asked in March of 2003 that, you know, a man with this condition, should he, in June of 2002, should he have been lifting 100-pound weights on an occupational basis would say, no, of course not. He's restricted from that. He may be able to do some other work, but no, he should, you know, he should be restricted from having to lift 100-pound weights. And so it's not surprising that every medical expert who has directly approached the question, and we're talking about Dr. Schor and we're talking about Dr. Harris and we're talking about the nurse reviewer from Sun Life, Ms. Haley, has said that, yeah, I mean, his condition is one that has existed for years and the restrictions and limitations that are placed upon him that prevent him. What, in your view, should be the holding of this court? In my opinion, Your Honor, I believe that this court, as I said under Jebbian, has the authority to say, well, the fiduciary made an error in the manner in which it denied Mr. Green benefits, and so, therefore, we're going to remand with an order that benefits be paid for the first 24 months, which is the own occupation period, and then Mr. Green should be reinstated for further analysis to make a determination as to whether he's capable of performing some other occupation. Would this court, if it did that, turn itself into a fact finder? Well, I don't believe so, Your Honor, because I believe the, well, I mean, I had a, well, I believe that the evidence, medical evidence is undisputed, that there is no evidence that says, looking at the policy properly, that Mr. Green is not disabled, and so I don't really think that there's any factual issue here at all. I think that every medical expert may not be. But when you win, you walk away with your victory. When you're going to have to go back to see whether you win or not, you should have an opportunity to supplement the record if you need to. Your Honor, that's fine, and if the court were, instead of taking my suggestion, were to remand, we believe that applying the proper standard, that we would like a rematch in this matter with the proper standard. And what would be this proper standard? The proper standard, Your Honor, would be a recognition that the, that Mr. Green insurance continued under the policy until such time as he was no longer disabled from his vertigo, and that it was not necessary that Mr. Green have a definite diagnosis of an orthopedic condition in June of 2002 at the time he left work. It was merely sufficient that because of an injury or sickness of some kind, that he was unable to perform the material and substantial duties of his occupation throughout the elimination period. That's the appropriate standard that should have been applied. It was not applied, and we believe that under that standard that we would prevail in the district court, Your Honor. The, one of the, one of the reasons why they were able to deny this case is the court, and I realize that the court has read all the papers and is well-versed on this case. When the case originally came in, the Sun Life Claims Handler, the medical reviewer, looked like a disabling case, sent it up the chain to pay benefits, and the supervisor decided, well, no, let's look at some other things. And it was sort of on that, in that framework that the question was posed with respect to disability to Dr. Hall, Sun Life's physician, the medical reviewer, and I think it's very telling that what he was asked was not, was Mr. Green disabled because of his orthopedic condition in June of 2002 when he left work from his manual job that required him to lift 100 pounds, because I think any physician in the world recognizing that it was shown in March of 2003 that he had this severe back condition, nerve impingement, which really no one disputed was disabling at that point, in which his treating physician had said had existed for some years, and Ms. Haley from Sun Life agreed with that. Any physician in the world would have said, well, yeah, he shouldn't be doing a job that required him lifting 100 pounds when he had that condition at the time, although no one knew it. And so the way the question was asked to him was, well, is there any evidence in the medical records that Mr. Green was complaining about a orthopedic condition at the time he left work in June of 2002? I think your brief made the point that it was a skillfully asked question. I think you'll respond. Very well, Your Honor. At that point, I'll save the remainder of my time for rebuttal unless the Court has any questions for me at this time. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Dan McGuire, and I'm here to represent the appellees, Sun Life and the benefit claims. There are two issues presented for the Court's review today. The first one is whether the district court made the proper determination on the benefit issue or whether its finding was clearly erroneous. If not, then there's no reason to reach the second issue, which is if the determination was clearly erroneous, then do the collateral benefit exclusions apply? Mr. Petty addressed briefly the issue of standard of review, and I'd like to do that just briefly as well, Your Honors. Of course, it's a de novo standard of review applied by the district court under ERISA. There's no dispute that the de novo standard of review was appropriate. Sun Life is not contending that an arbitrary and capricious standard of review is applicable. But the point that Mr. Petty makes on standard of review is that it's easier for the court to find clear error when the district court did not take any testimony. But in this particular case, as in all ERISA cases, or 99% of them, the district court reviews the administrative record and makes its findings based on a thorough review of the record. When the district court is conducting a de novo review, the district court can also hear evidence outside of the record. That's true, Your Honor. It doesn't appear what happened here. She didn't think that was necessary, or the parties didn't think it was necessary. Correct. But in rendering her decision, though, in making her findings, she applied a certain interpretation to the disabling clause in the policy, which is, I guess, what I'd like to talk to you about. Okay, then let me move right to that, Your Honor. She seems to have said that during the elimination period, to satisfy the elimination period, that the employer, the claimant, can only do so for one particular condition. Here, that condition was a vertigo. Right. So when he claimed benefits, it was based on the basis of vertigo. Correct. And he was stuck with that. Well, wasn't he stuck with it so much that that's how the policy operates? No, but she interprets it as saying he couldn't satisfy it by just showing that he was disabled during the elimination period. He would have to demonstrate that disabling condition prevented him from doing the duties of his job. Any disabling condition. Whatever it may be. Right. Had to be disabling at the time that he filed the claim, the time he left work. Well, he has to establish that he was disabled during the elimination period. Correct. For whatever reason. Correct. But that's not what she did. Well, that is what she did because, Your Honor, what she said was that the reason that Mr. Green left work was because of vertigo. And under the policy. Where does that come from? That little statement you just made, where do I find that in the policy? The first statement would be the definition of disability. Right. I've got that right here in front of me. It says means during the elimination period. And the next 24 months, the employee, because of injury or sickness, is unable to perform the material and substantial duties of his own occupation. Correct. Because of injuries or sickness. It's a functional test, Your Honor. Correct. So, in other words, there's got to be some causal connection between the injury or sickness and the reason he's not working. But you say that he stuck with whatever he told him at the beginning. Oh, I'm not saying he stuck with whatever he told him. What I'm saying is that that was the basis for his claim, and he didn't survive the elimination period based on that initial claim. But why is he stuck with just the initial claim? Why isn't it possible that there was a misdiagnosis and that he really was disabled because of all his orthopedic conditions? Because no doctor says that, even after the fact. Well, there's evidence to indicate here that his condition, his orthopedic condition, did exist during the elimination period. I agree with Your Honor that the orthopedic condition may have existed during the elimination period. However, the appropriate question is, did that orthopedic condition cause him to leave work? And the answer is no. Well, the district court never answered that question. Well, the district court did, Your Honor, address that issue when it said that the first complaints of neck pain were after the elimination period had already expired. But that's not what the evidence showed here. He complained during the elimination period about neck pain and shoulder pain and whatever. He also noted that he had an accident before the elimination period. Well, I would respectfully disagree with the court in terms of what he complained of during those 21 doctor's visits that he had during the elimination period. The only reference at all to anything that's conceivably related to his neck was pressure in his neck, which seemed to be more likely explained by a sinus infection that he was treated with antibiotics for. I'm not aware of any cervical condition that responds to antibiotics. Even the doctor that saw him at UCLA, Dr. Lenz, who was in February of 2003 after the elimination period had expired, couldn't say that the conditions of vertigo and dizziness were causally related to the cervical problem. So you would say, so you agree with me then, or maybe you don't agree with me, but if during the elimination period he could show he was disabled, maybe he started out with vertigo for 60 days and then he satisfied the remaining 120 days with some other condition, as long as he's disabled during that period. No, Your Honor, I would not agree with that, and here's why. Why not? Because the termination date of the insurance is when the employee leaves work or if the insurance is continued by reason of disability. In Your Honor's hypothetical, we have a condition where we have vertigo for the first, let's say, 45 days. He recovers from that, and then 20 days later, still within the elimination period, he has neck problems which are disabling. In that condition, in that situation, his insurance would have terminated as of the day he left work because it wouldn't have been extended because there's no reason to extend it because he didn't satisfy the elimination period. But what if he's claiming that he was disabled? I mean, his whole point in leaving work is that he was disabled during that period of time. But not from a cervical condition or a neck condition. He's not saying, I can't lift 100 pounds or pull down a tie bar because my neck hurts. He didn't see a doctor for a year before he left work about anything to do with his neck. He didn't see a doctor for six months after that. Then your position is that whatever he says at the very beginning is what he's stuck with. He must satisfy the elimination period on the basis of the reason why he left work. What I'm saying is, Your Honor, that we must identify what the sickness is that's causing him to leave work. When he leaves work, and he must satisfy the elimination period on the basis of that condition. Correct. So if during the time he makes his claim, he's not aware of another condition that exists, puts down X, and really it's X and Y, and later learns about Y, he's still out of luck. Well, that's not the case we have here, Your Honor, but to answer your question. It might well be the case here because I still think there's evidence in his record that shows that he had, his orthopedic condition existed during the elimination period. I think his orthopedic condition probably existed for years. I mean, what if his condition was congenital? Maybe he had it since he was born. I mean, we can't backdate the day of disability all the way to the time he was born. We have to look at the complaints that he made. No, we're looking at the time he left work and the elimination period. Correct. Why did he go to the doctor? Because he was dizzy. He had vertigo. Couldn't drive. The doctor said, Why can't you work? Because you can't drive because you're dizzy. That's the 21 next doctor visits are the reason. We must have read two different records that I was listening to you carefully. Certainly he went to the doctor at the end regarding his vertigo, but didn't he indicate problems prior to the time he decided he must quit? Didn't he continue working through certain problems that he had discussed? On this record? The record shows, Your Honor, that in 1998, which was three and a half years prior to the time he left work, that he had an X-ray which diagnosed some cervical problems. Yes.  Yes. That he returned to work and worked continuously, as far as we know, up until the time he left work because of dizziness. Yes. But he was having problems those times, and I guess we're talking about the same record. So that if he mistakenly thought X was the problem, and a doctor diagnosed it mistakenly and thought X was the problem, and in truth he later learns that, No, X wasn't the problem. The cause was Y, the thing that I complained about in 1998. And it continued. He's covered under this policy as I've read it. Now, maybe I've read it wrong. Tell me that I've read it wrong. Your Honor, what I will tell you is that there's no basis to connect those two conditions. There's no basis medically in the record from any doctor at any time to say that the reason that he was dizzy in June of 2002 was because of cervical problems. And the reason that we know that is because when he has cervical problems back in 1998, as Your Honor pointed out, what does he do? He complains. I have neck problems. I have neck pain. He doesn't go to the doctor in June 2002 and say, My neck hurts. I can't lift 100 pounds or I can't drive a truck. No, he talks about the symptoms, but that doesn't mean what caused the symptoms, you see. It doesn't rule out the problem that the back problem that preexisted was the cause of all the problems he had at the time he left us. Isn't that a way that this record could be considered? Now, I'm not suggesting that we are going to do what I understand your opponent to hope we'll do, and that is decide it. But aren't there problems with this record as it's postured? No, Your Honor, but there would be problems if we had a doctor at any time saying that the reason that he's dizzy in June 2002 was because of a cervical problem. And the question Your Honor asks is a medical question, and the medical questions are answered by the physicians whose records are in the file. And none of them say that there's a connection between the neck problems and the dizziness. Well, on the Danova review by the district court, the district court judge is not stuck with the record before the agency. And the plaintiff could have presented additional evidence. The doctors could have testified and the district court could easily have made a determination. A, he was not disabled at all during the elimination period. He didn't satisfy the disability. Or he was disabled during the elimination period. It was just the wrong diagnosis. And the court apparently didn't feel the need to do that. Well, that's because the way I read her findings, the fact of conclusions of laws, I think she gave an interpretation of the disabling clause, a very narrow and limited one. The way I read the policy, I sort of see it the way Judge Ferris just kind of articulated. May I then respond to that, Your Honor, with regard to the definition? I mean, tell me why I'm misreading the policy. Okay. The policy, I think the fundamental disconnect here is whether or not the definition of disability is satisfied by a condition, whether he has a condition or not. But the test is functional. And by that I mean that it's got to be a sickness which precludes the person from performing the duties of his or her occupation throughout the elimination period. And, of course, the person has to be under the care and attendance of a physician during the elimination period for that time. And how do we go about establishing a medical diagnosis? We have symptoms. We have a reporting of symptoms, a diagnosis, and then treatment. And if we follow that course here, we have Mr. Green complaining of symptoms involving dizziness in June of 2002 and not complaining of any problems with his neck until February of 2003. And the only time that the neck problem comes to the forefront is after the MRI results in 2003. And that's when Mr. Green is explained that the results of the MRI show that he's got a neck problem. Then all of a sudden the doctor's notes change. He's now coming in for a neck problem. And during the course of the elimination period, after his own Dr. Lee says that the vertigo is resolved, he goes back to Dr. Lee and he asks him, well, couldn't I be disabled from something else? Maybe it's mold. And he brought an article into the doctor to have him take a look at. And the doctor says here in the record, no, I can't help you with that. And so that's, you know, that's my position on that. It seems like the analysis is first, is there a sickness? And if so, what is it? Second, did the insured leave work because of that sickness? And third, did the sickness preclude the performance of occupational duties throughout the elimination period? And here the trial court made the proper findings. The sickness was vertigo. He left work because of vertigo. That's what his doctor said. But the vertigo resolved before the elimination period expired. What does that mean? It means that the policy terminated at the last day of work back in June of 2002. And the net complaints aren't made until nine months after that. See, I think that, well, I don't know. We're going to decide. And we're going to decide on the record so you can relax. But vertigo is a symptom. It isn't necessarily the disease. Is it? No, I think vertigo is a symptom, Your Honor. And I think in this case it's more likely a symptom of a sinus infection because it resolves in response to antibiotics. Or it could be a symptom of a problem with his inner ear. It could be a symptom of a number of things. However, it also could be related to the problem with his spine. I'm not a medical doctor, Your Honor, but the medical doctors in the file don't seem to say that. Even Dr. Lenz from UCLA doesn't say that. He says, well, it could be anything. There was one doctor who I think was having fun, kind of games. He says he kept trying to get me to say this, that, or the other, and he just doesn't qualify. I won't say it. He can't get it. And I think, good gracious, man, you listen to your patient and then you see if there's any basis. And the patient didn't know what was wrong with him, except he knew I'd better stop driving this truck because I'm dizzy and I can't drive the truck. So I agree with you that that's the symptom that finally eased him out of there. But if medically that symptom was caused by his problem, which he's had for a period of time and was continuing, there's no question but that it didn't continue, we've got a different case, I would think. And what Your Honor just expressed was the analysis that the district court as fact finder went through. And so if that finding is clearly erroneous, that's one thing. But on this particular record, when I don't see any doctor saying that there's a connection between this neck pain and the dizziness eight months before and the district court went through a full analysis of the whole record and entertained a trial on the issue, respectfully, Your Honor, I think that determination needs to be upheld. Well, as I read the findings of fact and conclusions of law, she approached this case from a certain perspective. And her findings don't cover, at least as I understand the case, don't cover all bases. I'm not sure how to respond to that, Your Honor. Well, I don't think she really answers the question, was he disabled during the elimination period? Well, Your Honor, I think the doctors answered that. No. The district court, Your Honor. Right. Findings of fact and conclusions of law. Right. I don't think that the district court finds that Mr. Green is disabled throughout the elimination period. But she doesn't, she does, she reaches that determination. On my understanding, my kind of take on this is that she wasn't applying the correct interpretation of the disabling provision. She said, essentially said, he has to be disabled. His inability to work has to be premised on the condition that he identified when he left work. And that condition has to exist throughout the entire six-month period. It has to preclude him from working during the six-month period. That's what he, what he identified as a condition must exist throughout the six-month period. I don't think that that's, my understanding of the policy provision, I think it's going to be the interpretation of the disabling provision. I don't see where it says that. It just says he's unable to work during the elimination period. Due to a six-month period. So he could have, as Judge Ferris was just saying, it could be a combination, misdiagnosed. I guess that's a chimerical possibility, but let's address that misdiagnosis issue just for a moment, Your Honor, if I may. The records are not consistent with the theory that there was a misdiagnosis. They're consistent with a history of a person who has sinus infections, that he has dizziness or head pressure in his sinuses that causes pressure in his neck that he mentioned in that one visit, and that it improves after a course of antibiotics. It also supports the fact that when new complaints are made for pain in the neck, then he's getting sent out for an MRI and another series of testing is performed. That's the reason why none of these testing, these MRIs were performed back during the elimination period, because he was not complaining of any neck pain. The idea is when does this condition, even if it existed for six months, a year, two years or more, when does it become symptomatic? And that's the key. When does it become symptomatic? Because it's at that time that it may or may not preclude him from performing the duties of his occupation. But if it's not symptomatic, then there's no way that it could. And therefore, the definition of disability, Your Honor, injury or sickness, must be the cause of his reason not working is sustained, and that's what the district court found. Okay. Well, I didn't get very much of my presentation, but I thought if Your Honors have any further questions, I'd love to entertain them at this time. I think the workers' compensation and other benefits exclusions are addressed in the brief, so I don't feel a particular need to address those unless Your Honors would like to hear more on the subject. I don't have any questions. Thank you. Thank you. Thank you, Your Honors. Just a few brief points. Just as a factual clarification, the court asked whether there had been any extrinsic evidence. I believe that both parties attempted to submit evidence outside the record, and I think the district judge uniformly told us that she was happy with the state of the record as it was. With respect to whether there was any evidence that these two symptoms were related, I submit that Dr. Lentz in fact concluded that they were, that in his initial diagnosis, one of the reasons he wanted an MRI was so he could determine if there was a right radiculopathy. He then, you know, looked at it and decided that there was one, and I submit to the court that that's evidence that the vertigo and the dizziness was in fact connected with the spinal problem. There were numerous complaints by Mr. Green in the medical records during the elimination period of orthopedic problems. First, Your Honors, you know, the notion that we're going to say that Mr. Green is essentially, you know, sort of inventing a new basis for his problems in March after the MRI, based on what we can read in the medical records is unfair because, you know, I've looked at the medical records. I can't read the vast majority of what's contained in there. They're essentially illegible. The district court even noted that herself, making the point that she can't tell what's in there. So to suggest that, well, Mr. Green wasn't complaining or never mentioned any orthopedic problems based on records that nobody is capable of reading, I submit to the court that it's unfair. But nonetheless, in some of the fragments that can be read, it's clear that Mr. Green complained about arm pain. He complained about neck pressure. Interestingly, the record at 209, the only document that Mr. Green filled out himself during the elimination period, and so we don't have to rely on a doctor's bad handwriting or a doctor's misdiagnosis, he checked blocks that said he had arthritis, back pain or injury, joint pain or injury, and he wrote in the handwritten comments that he suffered from arthritis in his neck. And so I submit that he was attempting to complain about these orthopedic problems. It's just that sometimes with doctors and HMOs, it's hard to get them to understand what the patient is complaining about. Your Honor, I would be happy to answer any questions the court may have about the record or anything else if there are any. I don't see any. Thank you, Your Honors. Thank you. We appreciate your arguments. The matter will be submitted.
judges: Farris, Paez, Conlon